```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    --------------------------------------x
 3  GREGORY MARONEY,

 4                            Plaintiff,

 5                                      7:20-CV-02788 (CS)(JCM)
        -vs-
 6                                      TELECONFERENCE

 7
    KSF ACQUISITION CORPORATION,
 8
                            Defendants.
 9  --------------------------------------x

10
        *Proceedings recorded via digital recording device*
11
                                United States Courthouse
12                              White Plains, New York

13                              Thursday, March 3, 2022

14

15  B e f o r e:

16                              HONORABLE JUDITH C. McCARTHY
                                Magistrate Judge
17

18  A P P E A R A N C E S:

19  BURSOR & FISHER, P.A.
         Attorneys for Plaintiffs
20  BY:  ANDREW OBERGFELL, ESQ.,

21
    GREENBERG TRAURIG, LLP
22       Attorneys for Defendant
    BY:  RICK L. SHACKLEFORD, ESQ.
23       PHILIP H. COHEN, ESQ.
         ANDREA N. CHIDYLLO, ESQ.,

24

25
```

1          THE DEPUTY CLERK:  This is the matter of Gregory

2  Maroney versus KSF Acquisition Corporation.

3          Counsel, state your appearances for the record.

4          MR. OBERGFELL:  Good morning, your Honor.  This is

5  Andrew Obergfell for the Plaintiff, Gregory Maroney.

6          THE COURT:  Good morning.

7          MR. SHACKLEFORD:  Good morning, your Honor.  Rick

8  Shackleford with Greenberg Traurig for Defendant KSF Acquisition

9  Corp.

10          MR. COHEN:  Good morning, your Honor.  Philip Cohen,

11  Greenberg Traurig, for KSF Acquisition Corp.

12          MS. CHIDYLLO:  Good morning.  Andrea Chidyllo,

13  Greenberg Traurig, for Defendant KSF Acquisition Corp.

14          THE COURT:  Good morning, Counsel.

15          So we had a conference on -- just a little while ago,

16  about a month, on February 3rd, and I have received -- there

17  were some issues that were -- that you brought up then and I've

18  received letters, Docket 50 and 51, which I have reviewed.  I

19  know there were two issues raised in Docket 51.  One was an

20  attorney/client privilege.  I understand that is no longer an

21  issue for the Court, but the e-discovery, scope and completion,

22  remains an issue.

23          Is that correct?

24          MR. OBERGFELL:  Yes, your Honor.

25          MR. SHACKLEFORD:  Yes, your Honor.

 1          THE COURT:  Okay.  Before we go into that, can you

 2  tell me also what has happened since we last spoke.

 3          MR. OBERGFELL:  Your Honor, this is Andrew Obergfell

 4  for the Plaintiff.

 5          As your Honor would recall, after the last conference,

 6  Defendant was to provide hit counts for our revised search

 7  terms, which we had provided shortly before the last conference.

 8  We received that hit report on February 17th, so two weeks after

 9  the conference before your Honor.  As soon as we received that

10  new hit report from Defendant, you know, we provided a proposal

11  to limit the overall number of hits and strings, and we provided

12  that proposal, I think, either the same day or the day after and

13  we have one string that's still in dispute which we're talking

14  about today, and, as I understand it, Defendant is in the

15  process of reviewing documents associated with those strings, or

16  at least will be in the near future.

17          There was also a challenge to the privilege -- some of

18  the privilege designations as your Honor referenced, and I think

19  those documents were produced last night by Defendant, but, you

20  know, the main issue is, you know, completing this document

21  production.  You know, we haven't seen the, you know, the

22  documents associated with, you know, the search term hits at

23  issue, so I think that's, that's the main issue right now.

24          THE COURT:  Okay.  So let me hear arguments on -- and

25  I believe that the only issue is the search terms as it relates

1  to line 6?  Or row 6?

2       MR. OBERGFELL:  Yes, your Honor, that's MCT oil and

3  coconut oil linked with label or labeling?

4       THE COURT:  Yep.  And this hit list has that at

5  getting 7,504 hits.

6       MR. OBERGFELL:  That's correct, your Honor.

7       THE COURT:  Okay.  So I want to hear arguments on

8  why...each side's position.

9       MR. OBERGFELL:  Yes, your Honor, and, again, this is

10  Andrew Obergfell for the Plaintiff.

11       So basically, your Honor, when we're dealing with, you

12  know, production of ESI, you know, it's black letter law, you

13  know, in this district that -- it's a two-step inquiry, one, is

14  there good cause, you know, for the production of the requested

15  discovery and is there a commensurate burden counterbalancing

16  that, you know, that inquiry, the good-cause inquiry.

17       On the question of good cause, you know, the very

18  heart of this case, your Honor, is about the label of the

19  product and specifically the ingredient MCT oil, otherwise known

20  as coconut oil, and whether the label claims associated with

21  that ingredient are substantiated, namely does the MCT oil

22  result in weight loss, does -- is it clinically proven, and so

23  these search terms were targeted to understand the communication

24  surrounding the labeling of the product, and also relevant to

25  that is that, you know, there's an fraud claim, there's GBL

1  claims in this case, and Defendant's knowledge of the efficacy

2  of the MCT oil and knowledge of whether or not the labeling was

3  false or deceptive is directly at issue in this case, and that's

4  why we provided that search term, to link up the challenged

5  ingredient with the actual labeling of the product.

6          Now, Defendant says, "well, MCT oil is an ingredient

7  in a number of our products," and that much is true.  However,

8  Defendant sought to limit the string by, you know, including the

9  term 'caprylic,' and caprylic acid is essentially a component on

10 of MCT oil.  However, we think that that would too...much --

11 would narrow the scope of the search so much that potentially

12 very relevant information would be omitted.

13         For example, one could imagine an e-mail string where,

14 you know, two employees are discussing and saying, you know, MCT

15 oil doesn't really result in weight loss and maybe we shouldn't

16 put it on the label.  That communication would be captured by

17 our proposed search term, it would not be captured by Defendant

18 unless they used the term 'caprylic,' which is a fringe term

19 that's unlikely to be used probably in modern -- you know, in

20 common discourse between employees.

21         So we think given the, the low number of overall hits

22 compared to the fact that this is a nationwide class action and

23 that the fact that this string seems to look at exactly what's

24 at issue in this case, namely the labeling and the MCT oil and

25 coconut oil ingredients specifically, that we think that our

1  string should be searched and relevant documents associated with

2  that string should be produced because, you know, it strikes

3  right at the heart of the case.

4         And weighed against that is Defendant has not

5  identified any specific burden in actually reviewing the

6  documents associated with this string and producing what's

7  relevant, and it's clear in this district, you know, based on

8  case law that a claim of undue burden has to be substantiated by

9  evidence, by affidavits, things of that nature, which Defendant

10  could have provided to this Court, but they didn't, so we have

11  what we think is a very relevant string and a proposed

12  limitation by Defendant that would leave out highly --

13  potentially highly relevant information, and, you know, weighed

14  against no real proposed burden by Defendant, we think that that

15  string, you know, should be searched.

16         And I'd also note that, you know, we've met and

17  conferred and we provided what we think is a pretty reasonable

18  limitation on what was the overall number of hits based on our

19  terms and we're really just trying to get to the brass tacks of

20  what's relevant in this case.

21         THE COURT:  Do we know what the hit would be if we

22  added the word 'caprylic'?

23         MR. OBERGFELL:  I do not know that information, your

24  Honor.  Perhaps Defendant does, though.

25         THE COURT:  Okay.

1          Who wants to speak on behalf of Defendant?

2          MR. SHACKLEFORD:  This is Rick Shackleford, your

3   Honor.  I'll take the main mode, but the question that the Court

4   asked directly, Ms. Chidyllo may know the answer to that

5   question, so I would defer to her on that before I weighed in.

6          MS. CHIDYLLO:  Hi.  I do not -- this is Ms. Chidyllo.

7   I do not know the answer, but I'm going to see if I can figure

8   it out as we're speaking here.

9          THE COURT:  Okay.  Mr. Shackleford, you can continue.

10          MR. SHACKLEFORD:  Yes, thank you, Your Honor, and I'd

11   like to begin by complimenting Counsel.

12          I think the meet-and-confer efforts in this case have

13   been productive, we had a conversation yesterday, so I think

14   we're moving things along and I, I hope the Court appreciates

15   that we are continuing to try to narrow the issues, so we've

16   resolved the privilege issue, we've dealt with some other stuff

17   and trying to minimize, you know, the time that we have to take

18   up on your Honor's calendar.  There are a couple things, though,

19   that were said that I would push back on, because I think it's

20   important to frame what the case is really about.

21          The case is about coconut oil as a standalone product,

22   and I think it's -- you can understand why we're having the

23   problem with this limitation if you just substitute the word

24   'butter' for 'coconut oil.'  If I sold the product claiming

25   butter as a standalone is an effective dietary supplement and

1  you should just take butter and eat butter as a standalone and

2  you'll lose weight and I get sued over that and I'm hit with

3  discovery asking for every product in an entire line of products

4  that uses butter as an ingredient, you get a sense of why it is

5  that we're having the problem we're having.

6          The case is about a unique dietary supplement, MCT

7  oil, and we've proposed a limiter, and there's no dispute that

8  the limiter would be unique to sorting out documents and

9  communications limited to the only product that's at issue, but

10 what Plaintiff wants to do is sweep in everything that uses

11 coconut oil as an ingredient.  It's a fat in food product, it's

12 used in lots of different things, and whether as a fat in a meal

13 replacement bar or some other product and whether that different

14 product may be effective for weight loss by using that fat as

15 opposed to a different fat is completely unrelated to the claim

16 here that's applied to the single standalone product that has

17 one ingredient, so that's why we proposed the limiter that we

18 did.

19         And so regardless of -- you know, is the burden

20 insurmountable?  I think the case law supports the notion that

21 you compare the burden with what is the value of the discovery

22 that's at issue.  That lies at the heart of proportionality,

23 what is the relative need versus the relative burden, so whether

24 the burden is enormous in the abstract as a standalone

25 proposition is different in a comparison between the burden and

1    the de minimus value.  This feels like discovery for the sake of

2    discovery.

3            I would ask what fact in issue is going to be made

4    more likely to be demonstrated by information pertaining to

5    thirty other products, and I believe that is the count, thirty

6    other products, that use coconut oil as an ingredient, and it

7    has to be listed on the label if it's used as an ingredient

8    whether there's any claim made about the coconut oil or not, so

9    that's why we proposed the limiter that we did.  We think it

10   makes imminent sense in the circumstances, it is appropriately

11   tailored to the facts at issue in the case and weeds out things

12   that aren't at issue and can't possibly be at issue.

13           So that's why we have developed the limiter that we

14   have, and we believe -- and we're happy to run the search,

15   review the documents, produce whatever's responsive, but that's

16   why we're here, that's the one thing as of today that we haven't

17   been able to resolve.

18           THE COURT:  So tell me, how do you address the fraud

19   issue that Plaintiff is saying, that it goes to, you know, what

20   the knowledge that Defendants had?

21           MR. SHACKLEFORD:  Well, there's no claim made on the

22   other products that the use of coconut oil is what makes the

23   difference in a snack bar or a meal replacement or some other

24   product.  That's where we address the issue, so there would be

25   no fraud claim.  It's just not relevant to that.  The issue is

1 whether this dietary supplement as a standalone is, you know,

2 clinically proven to promote weight loss.  That's his theory.

3 Not that I've used the entire keto diet and you've used coconut

4 oil as a key component of it.  It's just one product.

5        So, again, I go back to butter.  I may or may not

6 believe butter as a standalone is great, but there's lots and

7 lots of other reasons why one would use butter as an ingredient,

8 as a fat, in a completely different product.

9        MR. COHEN:  Your Honor, it's Philip Cohen.

10       Just to add to Mr. Shackleford's point, we do have an

11 unlimited search with respect to 'clinically proven' and 'oil'

12 and 'MCT oil' and 'coconut oil.'  We're running that search,

13 we're doing that search.  The only one that we're looking for

14 the limitation on is the search that includes the label, so if

15 there's anything that relates to clinically proven and this

16 product, it will be captured.

17       THE COURT:  Mr. Obergfell.

18       MR. OBERGFELL:  Yes, your Honor, I'd like to just

19 address a few points there.

20       The first is that in terms of the proposed limiter,

21 it's incorrect to say that the term 'caprylic' only appears on

22 this specific product because caprylic acid is a component of

23 MCT oil and it's, at least as far as the SlimFast company is

24 concerned, considered to be a beneficial ingredient.  It does

25 appear on at least on one other product and that's the

1  ready-to-drink shakes, so that it's just the fact of the matter

2  that it is true that there is going to be -- you know, this

3  ingredient is, is across different product lines.  However, this

4  particular product is literally called MCT oil, so it's

5  difficult to pinpoint this product in a more specific way.

6            And, your Honor, the bottom line is, I provided a

7  hypothetical in my original presentation and that is that, for

8  example, if there is an e-mail correspondence that says "MCT oil

9  does not contribute to weight loss and, therefore, we can't put

10  it on the label," just imagine that was in an e-mail, that would

11  be directly relevant to our claims regarding the -- tying the

12  MCT oil to purported weight loss, which is exactly what the

13  challenge label is, clinically proven to lose weight and keep it

14  off.  So I appreciate that Defense Counsel has searched the

15  clinically proven aspect of it, that is one aspect of it, but

16  another aspect of it is the weight-loss aspect, and if you read

17  Judge Seibel's decision on the MTD, you know, she found it to be

18  plausible that, you know, a reasonable consumer could believe

19  that consuming the MCT oil could lead to weight loss and

20  maintain weight loss, so we're entitled to take discovery on

21  that issue.

22            Now, I'm sympathetic to the fact that there could be

23  some overlap with other products, but I can't have a situation

24  where evidence like that, communications like that, are left out

25  of the production because of an artificial limiter of the term

1  'caprylic' which may or may not appear, so the essence of the

2  dispute is that I can't live with the fact that that kind of

3  evidence may be left out of the search for the benefit of a

4  marginally lower hit count.

5          THE COURT:  Mr. Shackleford?

6          MR. SHACKLEFORD:  It is utterly conjectural and

7  speculative.  We can invent all sorts of hypothetical scenarios

8  of what might happen or what might be there and we can do it

9  until we're blue in the face.  The reality remains that it's a

10 one-sided burden and it's a one-sided expense to chase down

11 these, you know, rainbow unicorns.

12          Again, I come back to the point that this is about not

13 coconut oil, not MCT oil.  If this were a case about MCT oil,

14 they would have pled it differently and they would have

15 implicated other products.  This is a case about a single

16 product and whether this single product used all by itself is

17 clinically support -- clinically proven to support weight loss.

18 That's the theory.  Plaintiff is the master of his own theory,

19 that's what he pled, but once you do that, there are

20 implications that are going to confine the four corners of

21 discovery, so living within the four corners of the complaint,

22 you're suing over this specific product, let's limit the

23 discovery to this specific product.  That's the point of the

24 limitation that we've suggested.

25          And what you've just heard is that there might be all

1  other kinds of things talking about all kinds of other products

2  out there with different ingredients, different functions,

3  different uses, that aren't at issue in the case.  He's chosen

4  his theory; let's conduct discovery consistent with the four

5  corners of the complaint.

6          THE COURT:  And, Ms. Chidyllo, did you find out what

7  the hit -- how the hit would change?

8          MS. CHIDYLLO:  I do not believe we have that row with

9  caprylic and what that row's change would be now.  We'd have to

10  get that information.

11         THE COURT:  So I am going to...let me just look at

12  your letter for a second.

13         (Brief pause)

14         THE COURT:  I'm going to deny Plaintiff's request and

15  allow Defendants to add the term 'caprylic' to it without

16  prejudice to come back if you should find things in what has

17  been produced in all of the production that would lead you to

18  believe that there was something that might be missing that you

19  need.

20         This isn't the only form of discovery in this case.

21  You're going to be able to ask, you know, to witnesses what they

22  understood and, you know, what they understood about the MCT oil

23  and it as a standalone product.  You are looking at one product

24  here, not the oil in all products, not the labeling in all

25  products.  It's just in this one product.

1           I do believe when you're looking at proportionality,

2    it's not just did it have good cause and is it a burden, it's

3    really you're supposed to be weighing it on kind of the

4    relevance, needs of the case, and whether it's proportional to,

5    to both the need and the burden it'll have on.  I don't believe

6    -- you know, you're getting a lot of documents.  You're going to

7    get a lot of documents you're going to be reviewing.  I don't

8    think that narrowing this is going to limit you from getting

9    something that you need in this case.

10          As I said, if you find that something in the other

11   production reinforces your need to change it or something in

12   this production, it goes down too dramatically, you know, forces

13   your need to change it, then we can discuss it, it's without

14   prejudice for you to come back, but I don't see -- I believe

15   you're getting what you need to determining the facts of this

16   case, what the Defendants knew, and you'll have an opportunity,

17   also, to depose people to find out what they knew, what they

18   believed, when they were involved in the labeling, and what they

19   were writing on the label.

20          So I must ask you, how are you doing for production,

21   you know, discovery?  You have fact depositions April 29th.

22   When do you think we're going to get past this...document

23   discovery?

24          MR. OBERGFELL:  Your Honor, I'd have to defer to

25   Defendant on that because they're currently running the searches

1  right now, but I agree timing is an issue.

2         THE COURT:  Counsel for Defendants, who wants to

3  address this?

4         MR. SHACKLEFORD:  I'll start, your Honor.  We continue

5  to work diligently on it.  As we explained in our letter brief

6  last week, it is a small in-house legal department and obviously

7  they have other cases and other demands on their time.  I spoke

8  with Mr. Obergfell yesterday, we are certainly amenable, and if

9  it's necessary and happy to do it today, to modify the

10 scheduling order.

11        We really have two currencies that you deal with in

12 completing discovery, time and money, and if there's no

13 prejudice and we're mindful of the Court's schedule and the

14 burden it creates by moving things around, but if extra time is

15 necessary and reasonable time, you know, we talked about a

16 notion of 60 days to make sure that the documents are reviewed,

17 produced, and the Plaintiff has enough time to, you know, review

18 them, simulate them, decide the questions to ask of witnesses

19 and be able to do that in an orderly fashion.

20        The other currency's money.  If you do that to meet a

21 deadline, then it increases the cost and the burden of trying to

22 get it within the deadline, and not to suggest that time is

23 cheaper than money, but sometimes in the circumstances, that's a

24 reasonable accommodation to make, but we are proceeding a pace.

25        THE COURT:  So you don't know when it's going to be

1  produced.

2         MR. SHACKLEFORD:  Since I don't have them in my hands

3  personally, I can't tell you.

4         THE COURT:  Can you tell me what schedule they're

5  working on, what kind of resources they're committing to it,

6  whether it's a priority or not a priority...

7         MR. SHACKLEFORD:  It's absolutely a priority, and we

8  are on the phone several times a week with our counterparts in

9  the in-house legal department.  Their IT department is located

10 in Ireland, so we deal with some lengthy time zone differences,

11 as well as getting information and the review of the documents,

12 but that's -- you know, it's ongoing.  It hasn't been set aside

13 in deference to other things, but by the same token, it's not

14 the only thing on the legal department's plate.

15        THE COURT:  I'm disinclined to give you any extension

16 of time right now.  4/29 is 60 days from now.  If I give you

17 another 60 days, I'm giving you 120 days to do this and you have

18 no idea whether you're going to need that or not, and my

19 experience is if you get it, you use it, and so you're not

20 getting it.

21        I want you to continue working on this at pace, we're

22 going to talk in 30 days, and you are going to give me a report.

23 I would expect by that point -- and I would expect that there

24 would be rolling production and that you don't wait until

25 everything is reviewed, which, you know, I would expect there's

1  rolling production from the client to you and from you to the

2  Plaintiff.  There's no need to, you know, hold up -- yes, of

3  course, you know, if you've only looked at a hundred documents,

4  there's no need to do tranches of a hundred, but you shouldn't

5  hold up until everything's done, so...you are likely to need

6  more time, but you really don't know what you need at this point

7  and I want to keep a little bit of pressure on you.

8          I appreciate the fact that the team is, you

9  know...diligently working as you described it.  I don't want

10 that to change, and I want them to know that you have to report

11 to me in four weeks that, you know, where's everything at, how

12 much has been produced, and my hope is that I do not hear

13 "nothing" and that I hear "everything" or "almost everything" at

14 that time.  Four weeks should be enough time to -- you know, if

15 you're really diligently working on it.

16         I know people have other jobs, other responsibilities,

17 not other jobs, but other responsibilities, but if time is spent

18 every day on it, they can get through the documents.

19         MR. SHACKLEFORD:  I appreciate that, your Honor.  That

20 will be the report out, that we remain under the, the current

21 schedule and need to be working diligently to meet that, and I

22 fully expect next time we talk to you that if it's not

23 completed, I will be able to give you a date certain by when it

24 will.

25         THE COURT:  Yeah, and when I have that, I can have a

1  better sense of what you need and Mr. Obergfell can have a

2  better sense of what he needs and can tell the Court, "yeah, I

3  need X because I'm going to do X many depositions" and "I've

4  just got the documents" or "I've only reviewed half of them," et

5  cetera, so let's talk in a month from now.

6          Ms. Hummel, I think a month from now I have

7  (inaudible) conference, so let's talk the week after that.

8          THE DEPUTY CLERK:  So you're available on the 11th at

9  eleven.

10          THE COURT:  April 11th at eleven a.m.?  Does that work

11  for everyone?

12          MR. OBERGFELL:  That should be work for Plaintiff,

13  your Honor.

14          MR. SHACKLEFORD:  Again, your Honor, we'll get it

15  covered.  We've got three of us, so somebody will be able to

16  talk to you on the 11th.

17          THE COURT:  Okay, so we will talk on April 11th at

18  eleven a.m.

19          Thank you, everyone.

20          MR. OBERGFELL:  Thanks, your Honor.

21          MR. SHACKLEFORD:  Thanks, your Honor.

22          THE COURT:  Be well.

23          MS. CHIDYLLO:  Thank you.

24

25

1  Certified to be a true and accurate

2  Transcript of the digital electronic

3  Recording to the best of my ability.

4  _____

5  Tabitha R. Dente, RPR, RMR, CRR

6  U.S. District Court

7  Official Court Reporter

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25